UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Juan Lopera, Marlon Giraldo, Mauricio Espinal, Hector Cardona Steven Giraldo, William Ruiz, Pedro Hernandez, Luis E. Ardila-Lazaro by and through his parents and next friends, Luis Ardila and Hziel Ardila, Brian Ocampo by and through his parent and next friend, Alba Jaramillo, Stephen Patino by and through his parent and next friend, Lilian Giraldo, Joulder Salazar by and through his parents and next friends Youlder Salazar and Martha Duran, Milton Ricuarte, Jr. by and through his parents and next friends, Milton Ricuarte, Sr. and Elizabeth Rivera, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| Town of Coventry by and through its Treasurer, Warren West, Kevin P. Harris in his individual capacity and in his capacity as a police officer for the Town of Coventry, Kevin Kennedy in his individual capacity and in his capacity as a police officer for the Town of Coventry, David Nelson in his individual capacity and in his capacity as a police officer for the Town of Coventry, Stephen A. Michailides in his individual capacity and in his capacity as a police officer for the Town of Coventry, Ronald E. DaSilva individually and in his capacity as Chief of Police for the Town of Coventry, and Brian J. O'Rourke individually and in his official capacity as the former Chief of Police for the Town of Coventry, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

C.A. No.   08-123 S

## DECISION AND ORDER

WILLIAM E. SMITH, United States District Judge.

In this action, Plaintiffs, now former members of the Central Falls High School boys soccer team, claim their civil rights were violated when they were subjected to a humiliating search in front of a crowd of unruly spectators by the Defendant police officers.

While dismayed and disappointed by the officers' lack of profesional judgment and the appalling conduct of the crowd, the Court is compelled to conclude that the police officers' conduct is covered by the doctrine of qualified immunity. Moreover, Plaintiffs have failed to satisfy their burden with respect to their claims of discrimination and municipal and supervisory liability. So, for the reasons explained in detail below, the Defendants' Motion for Summary Judgment is granted.

I.   Factual Background[1]

On September 28, 2006, the Central Falls High School boys soccer team played an away game against Coventry High School. The Central Falls team arrived by bus. Before the game began, five or six Central Falls players used the bathrooms located inside the Coventry boys locker room. While inside, one of the Central Falls players noticed a security guard keeping an eye on them.

---

[1] The facts described are taken from the record evidence including depositions of the relevant players in the controversy. While reviewed from the standpoint most favorable to the Plaintiffs, as required at the summary judgment stage, the basic facts are essentially undisputed.

The game was played and resulted in a tie. After the game, Coach Marchand (the Central Falls coach) sent his team to the bus and followed behind them. Before Coach Marchand reached the bus, approximately twenty players from the Coventry football team stopped him, and in profanity-laced terms accused the Central Falls players of stealing electronic devices (iPods and cell phones) from the Coventry locker room.

Coach Marchand told the football players that he would get to the bottom of the allegation and had them follow him to the team bus. The Central Falls players already were on the bus waiting to leave. Coach Marchand entered the bus and told his players: "everybody needs to put their game bag, varsity bag and their book bags . . . on their laps." The coach and his assistant coach then searched each bag for the alleged stolen items. If one of his players had an iPod or cell phone, Coach Marchand asked for proof of ownership. In his deposition, he characterized the search as a good one -- "I think we did a Columbo search, you know, CSI." The entire search took twenty to twenty-five minutes and none of the missing items were found.

When Coach Marchand exited the bus, the original group of twenty football players had grown to about fifty or sixty students and adults. The Coventry Athletic Director was also waiting. According to Coach Marchand, at this point the crowd was extremely

vocal, shouting derogatory and racist remarks at his team and threatening not to disperse until the missing items were found.

As Coach Marchand began to discuss the situation with the Coventry Athletic Director, the four Defendant police officers arrived on scene. The officers entered the parking lot with sirens wailing and "boxed-in" the bus with their police cruisers. Coach Marchand and the Athletic Director then brought the officers up to speed on the situation. Coach Marchand informed the officers that the crowd suspected his team of stealing (or in the coach's own words: that his players were the "prime suspects.") A discussion ensued and at some point, after a "pregnant pause" in the conversation, the topic of whether the officers could do their own search came up. The parties agree it was at this point Coach Marchand consented to another search of his players. (In his deposition, however, Coach Marchand explained that he only consented because he felt compelled to do so under the circumstances.)

After obtaining Coach Marchand's consent, the officers ordered the Central Falls players to exit the bus with their belongings and stand with their backs against the bus. Up to this point, the police officers made little to no effort to quell or disperse the

crowd, even as the crowd verbally assailed the players shouting racist epithets and accusations of theft.[2]

The search of the players began with the officers ordering each player to step forward one at a time with his bag. The officers then sorted through the contents of each bag on the hood of a police cruiser. If one of the officers discovered an iPod or cell phone, he held it up for the crowd to see -- purportedly to allow the "victims" a chance to identify the stolen property. Some of the boys were asked to stretch their waist band and lift their shirt so the officers could make sure they were not hiding anything, and a few of the boys were subjected to pat down searches. The entire search by the police, all of which took place in front of the angry mob, lasted approximately one hour and none of the missing items were found.

Undeterred, the mob persisted in its boorish behavior, even after the search ended. Concerned that the mob would take matters into its own hands, the officers in classic too little, too late fashion decided for safety reasons to escort the bus out of town.

II. Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to

_____

[2] For example, one player heard a woman in the crowd call the boys "spics." Coach Marchand testified that people in the crowd used phrases like: "those people," "they're good at hiding things," "they're sneaky, you know it," and made reference to the boys being from "the ghetto."

judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists if a "reasonable jury could return a verdict for the nonmoving party," and a fact is material if it has the "potential to affect the outcome of the suit." <u>Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.</u>, 473 F.3d 11, 15 (1st Cir. 2007). The Court views all facts and draws all reasonable inferences in favor of the nonmoving party. <u>Torrech-Hernandez v. Gen. Elec. Co.</u>, 519 F.3d 41, 46 (1st Cir. 2008).

When the defense of qualified immunity is raised on summary judgment, as it is in this case, the Court begins by "identifying the version of events that best comports with the summary judgment standard and then [asks] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." <u>Morelli v. Webster</u>, 552 F.3d 12, 19 (1st Cir. 2009).

III. Discussion

Plaintiffs' Complaint alleges six causes of action brought pursuant to 42 U.S.C. § 1983 and state law. Counts I-III allege that the officers violated the boys' Due Process,[3] Equal Protection, and Fourth Amendment rights.[4] The remaining causes of

---

[3] At oral argument, Plaintiffs' counsel conceded that the Due Process claim (Count I) overlaps their claim under the Fourth Amendment (Count III) and was not intended to allege a violation of Plaintiffs' substantive due process rights.

[4] Plaintiffs' § 1983 claims against the police officers are asserted in both the officers' individual and official capacities. Because claims brought against a municipal employee in his or her official capacity are essentially claims against the municipality

action allege violations of R.I. Gen. Laws § 9-1-28.1, Invasion of Privacy (Count IV); § 31-21.2-3 Racial Profiling (Count V); and § 9-1-35 Ethnic Intimidation (Count VI).   Although not alleged in separate counts, Plaintiffs' Complaint also presents claims against the Town and the Defendant police chiefs for a failure to train and supervise the officers.[5]   See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

   A.   Qualified Immunity

   Plaintiffs allege the officers violated their Fourth Amendment right against unreasonable searches.   On this claim, the officers have asserted the defense of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   Pearson v. Callahan, 555 U.S. --, --, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity shields officials who perform their duties

---

itself, they are duplicative of Plaintiffs' direct action against the Town.   See Hafer v. Melo, 502 U.S. 21, 25-27 (1991).   Thus the Court need not consider each official capacity claim separately.

   [5] During oral argument, Plaintiffs' counsel clarified that the Complaint indeed contained claims for failure to train and supervise.   However, in the Court's view that is debatable. Notwithstanding the inartfully drawn Complaint, the Plaintiffs received the benefit of the doubt, but because the Defendants' motion only addressed the causes of action specifically delineated in the Complaint, the Court allowed them to supplement their motion and address the merits of the two additional claims.

reasonably from liability and "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. at 815 (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Determining whether a public official is entitled to qualified immunity is a two-step inquiry. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). Under this test, "[a] court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Id. (citing Pearson, 129 S. Ct. at 815-16). The clearly established prong has two aspects: (1) the clarity of the law at the time of the alleged civil rights violation and (2) whether given the facts of the particular case a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. Id. A negative answer to either question results in a finding of qualified immunity for the official asserting the defense. Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001).

The order in which the questions are answered rests within the discretion of the Court. See Pearson, 129 S. Ct. at 813 (holding that the inquiry need not be conducted in a strict sequential order). A judge may skip ahead and decide whether the right at

issue was clearly established without deciding whether that right was violated.  Id. at 820-21.  In some cases, including this one, the two-step analysis blends together, where the question of whether a constitutional violation occurred depends on whether the law regarding the officers' right to rely on a consent to search was clearly established, and, if not, whether the officers' actions were objectively reasonable.  See Anderson v. Creighton, 483 U.S. 635, 648 (1987) (Stevens, J., dissenting) (noting the "double standard of reasonableness" that apparently applies in Fourth Amendment cases where qualified immunity is invoked).

    1.  Constitutional Violation

    Here, it is a close call as to whether a constitutional violation occurred.  There is no question that the Fourth Amendment applied to the search of the players and their belongings.  See New Jersy v. T.L.O., 469 U.S. 325, 337-338 (1985) ("A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtably a severe violation of subjective expectations of privacy.").  And, it is undisputed that the police did not have a search warrant and the search of the boys was not supported by probable cause.  See Arizona v. Gant, -- U.S. --, 129 S. Ct. 1710, 1716 (2009) (stating that warrantless searches are per se unreasonable under the Fourth Amendment and justified only under specifically established and well-delineated exceptions).  A search

of a public school student will survive constitutional scrutiny if supported by a reasonable and individualized suspicion "that the search [would] turn up evidence that the student has violated or is violating either the law or the rules of the school." T.L.O., 469 U.S. at 342.  A reasonable suspicion, as opposed to probable cause, is required because Fourth Amendment rights "are different in public schools than elsewhere," and strict adherence to a traditional Fourth Amendment analysis would undercut the "special needs" that exist in the public school context.  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656 (1995).

Defendants concede, at least for purposes of this argument, that it is unlikely a reasonable suspicion existed to justify the search of the Central Falls players.  Instead, the Defendants contend no constitutional violation occurred because Coach Marchand consented to the search in loco parentis.  Generally, a search conducted pursuant to a valid consent is constitutional. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  Furthermore, the ability to give valid consent is not limited to a person with actual authority to consent.  Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990).  Consent may be given by a person with apparent authority; that is, an individual whom the officer reasonably believes has authority to consent.  United States v. Carrasco, 540 F.3d 43, 49 (1st Cir. 2008) ("[S]o long as law enforcement officers reasonably believe that the person who gives consent has the

authority to do so, they may rely on that consent."); <u>United States</u> <u>v. Meada</u>, 408 F.3d 14, 21 (1st Cir. 2005). Coach Marchand's authority to consent on behalf of his players, however, is far from clear, and even though the existence of apparent authority would, in essence, dictate a finding of no constitutional violation, the question of the officers' reasonableness, in the context of a qualified immunity analysis, are more properly explored under the clearly established prong.

Therefore, the prudent approach in this case is to resolve the qualified immunity analysis by examining the clearly established prong, leaving the question of whether an actual constitutional violation occurred to the side.

### 2.   Clearly Established Right

A right is clearly established when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Wilson v.</u> <u>Layne</u>, 526 U.S. 603, 615 (1999) (quoting <u>Anderson</u>, 483 U.S. at 640). The inquiry requires the Court to consider the state of the law at the time of the challenged act, or in other words "conduct the judicial equivalent of an archeological dig." <u>Savard v. Rhode</u> <u>Island</u>, 338 F.3d 23, 28 (1st Cir. 2003) (en banc). If "controlling authority" on the issue does not exist, a plaintiff may point to a "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful."

Bergeron v. Cabral, 560 F.3d 1, 11 (1st Cir. 2009); see Wilson, 526 U.S. at 617. Careful attention also must be paid to the factual nuances of the case, so as to properly define the right at issue. Wilson, 526 U.S. at 615 (citing Anderson, 483 U.S. at 641); see also Bergeron, 560 F.3d at 11. And, when guidance concerning the right is lacking or unclear, qualified immunity attaches because the law does not penalize officers for "picking the losing side of the controversy." Wilson, 526 U.S. at 618; Joyce v. Town of Tewksbury, 112 F.3d 19, 22 (1st Cir. 1997) (en banc). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citations omitted). At bottom, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Maldonado, 568 F.3d at 269.

Defendants contend that in the eyes of the officers at the scene, Coach Marchand had the requisite apparent authority to consent to a search, and it was reasonable for them to perceive him as acting in loco parentis over the players. Plaintiffs respond that it is well settled that the in loco parentis doctrine in the student search context cannot justify the search of a student. Plaintiffs do acknowledge that at one time the law considered a

school official to act broadly *in loco parentis*, but they argue that over the last thirty years, that notion has become seriously outdated.

In T.L.O., the Supreme Court appeared to soundly reject the doctrine of *in loco parentis* as a rationale to justify a search of a student: "In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents, and they cannot claim the parents' immunity from the strictures of the Fourth Amendment." T.L.O., 469 U.S. at 336-37. Later, however, the Supreme Court added confusion when it referred to the powers school officials have over students as "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." Vernonia, 515 U.S. at 655. Vernonia acknowledged "that for many purposes school authorities act *in loco parentis* with the power and indeed the duty to inculcate the habits and manners of civility." Id. (quoting Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 684 (1986) (internal quotations omitted)).

Recently, the Supreme Court passed up an opportunity to clarify whether the *in loco parentis* doctrine has any significance in school search cases. See Safford Unified Sch. Dist. No. 1 v. Redding, -- U.S. --, 129 S. Ct. 2633, 2637 (2009). In Redding, the Supreme Court reviewed the conduct of a school official who

subjected a thirteen-year-old student to a search of her bra and underpants on the suspicion that she was secreting prescription and over-the-counter drugs.  The court held that the search violated the student's constitutional rights, but because the relevant law that surrounded the right was not clearly established, the school official who ordered the search was entitled to qualified immunity. Id. at 2644.[6]

In light of the Supreme Court's silence on the issue and the rather clear language of T.L.O., a persuasive argument could be made that the *in loco parentis* doctrine serves no purpose in cases involving the Fourth Amendment rights of public school students. However, based on the full record of commentary on the issue, this Court cannot conclude that this was a clearly established principle of constitutional law in 2006.  See Morse v. Frederick, 551 U.S. 393, 416 n.6 (2007) (J. Thomas, concurring) (stating that at least nominally the Supreme Court continues to recognize the applicability of the *in loco parentis* doctrine to public schools). Indeed, such a conclusion is not possible without ignoring the Supreme Court's statements in Vernonia and Frasier.

---

[6] Justice Thomas's partial dissent urged the Court to adopt an *in loco parentis* standard to govern all school search cases, a point the majority declined to address.  See Safford Unified Sch. Dist. No. 1 v. Redding, -- U.S. --, 129 S. Ct. 2633, 2646, 2655 (2009) (Thomas, J., concurring in part, dissenting in part) (advocating for a "return to the common-law doctrine of *in loco parentis*" and a "complete restoration" of the doctrine) (emphasis added).

A review of circuit courts' decisional law also contributes to the lack of clarity on the issue.  The courts that have referred to the *in loco parentis* doctrine have done so in a way that makes it appear that the doctrine is a viable source of authority to justify a school official's actions.  <u>See</u> <u>e.g.</u> <u>Hampton v. Oktibbeha County Sheriff Dep't</u>, 480 F.3d 358, 362 (5th Cir. 2007) (stating that school officials act *in loco parentis* in dealing with students); <u>Ramos v. Town of Vernon</u>, 353 F.3d 171, 183 n.5 (2d Cir. 2003) (implying that in a public school the *in loco parentis* doctrine allows for a greater degree of control over children); <u>Gruenke v. Seip</u>, 225 F.3d 290, 307 (3d Cir. 2000) ("Public schools must not forget that '*in loco parentis*' does not mean 'displace parents.'"); <u>Wojcik v. Town of N. Smithfield</u>, 76 F.3d 1, 3 (1st Cir. 1996) (indicating that school officials acted *in loco parentis* in connection with a Fourth Amendment seizure of a child); <u>Hassan v. Lubbock Indep. Sch. Dist.</u>, 55 F.3d 1075, 1080 n.15 (5th Cir. 1995) (citing <u>Webb v. McCullough</u>, 828 F.2d 1151 (6th Cir. 1987) (stating that school field trips often present greater, not lesser, challenges to school officials and justify *in loco parentis* authority as well as official authority)); <u>Rhodes v. Guarricino</u>, 54 F. Supp. 2d 186, 192 (S.D.N.Y. 1999) ("Much more than when on their home campus, defendants were acting in loco parentis to plaintiffs."); <u>see</u> <u>also</u> <u>Seal v. Morgan</u>, 229 F.3d 567, 582 (6th Cir. 2000) (Suhrheinrich, J., dissenting in part) ("In addition to their

duty to educate, schools act *in loco parentis*."); <u>Schleifer by Schleifer v. City of Charlottesville</u>, 159 F.3d 843, 861 (4th Cir. 1998) (Michael, J., dissenting) ("the teachers and administrators of a public school will act 'in loco parentis' while children are in their physical custody because parents 'delegate part of [their] authority' to the school by placing their children under its instruction"); <u>see</u> <u>generally</u> <u>Knox County Educ. Ass'n v. Knox County Bd. of Educ.</u>, 158 F.3d 361, 375 (6th Cir. 1998) (upholding a program of conducting suspicionless drug testing of teachers and administrators in part because of the *in loco parentis* obligations imposed upon them by state statute). <u>But</u> <u>see</u> <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 594 n.9 (2d Cir. 1999) ("the Supreme Court has rejected the notion that public schools generally act *in loco parentis* in their dealings with students").[7] Courts have bandied about the phrase to such an extent that it is far from clear exactly what role the *in loco parentis* doctrine plays in a Fourth Amendment analysis, particularly in the specific factual context presented here.

---

[7] So there is no confusion, the Court is not suggesting that these authorities stand for the proposition that Coach Marchand had the authority to consent by virtue of any *in loco parentis* status he may have had.  All the Court is saying is that the case law on the limits of a school official's *in loco parentis* authority in the specific factual context of this case is not sufficiently clear so that a reasonable police officer would be on notice that searching players based on the consent of their coach is unconstitutional.

16

Based on all this, it cannot be said that the law in 2006 was clearly established concerning whether a high school coach chaperoning his players during an away game could or could not consent to a search of his players by police *in loco parentis*. What is clear, however, is that Fourth Amendment rights "are different in public schools than elsewhere; [and] the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." Vernonia, 515 U.S. at 656.    Therefore, because the law was not clearly established concerning Coach Marchand's authority to consent to the search, the Defendant officers were entitled to rely on the consent.

Plaintiffs' argument -- that if a public school official cannot consent to his own infringements of students' Fourth Amendment rights, see T.L.O., 469 U.S. at 336-37, then he cannot authorize another to accomplish the forbidden act -- is logically persuasive, but ultimately unavailing to block qualified immunity. In addition to the muddy state of the case law described above, the argument also overlooks the question of the reasonableness of the officers' (mis)judgment. Bergeron, 560 F.3d at 12-13.    If the officers could reasonably have believed that they were able to rely on Coach Marchand's consent (even if that belief was wrong), they would be entitled to qualified immunity. Id. at 13; Jennings v. Jones, 499 F.3d 2, 18 (1st Cir. 2007) ("[E]ven if an officer's conduct violated clearly established Fourth Amendment law, he may

17

still be eligible for qualified immunity if he was reasonably mistaken as to the degree of force he should have used."). Given the state of the law at the time, and Coach Marchand's apparent authority over his players, it was reasonable for the officers to have believed they could rely on Coach Marchand's consent and qualified immunity must apply.

Attempting to avoid this result, Plaintiffs point to a written Coventry Police Department policy and R.I. Gen. Laws § 16-21.5-3, both of which deal with interrogating minors, and argue that in light of these authorities it was clearly established that Coach Marchand could not consent *in loco parentis*.[8] This argument fails for two reasons. First, the Coventry policy and § 16-21.5-3 only apply to questioning and not to searches; and, second, these authorities do nothing to clarify the state of federal constitutional law.

"Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates <u>some</u>

_____

[8] In pertinent part, the statute requires that:

Before making a high school pupil under eighteen (18) years of age available to a law enforcement officer for the purpose of questioning, the principal of the school, or his or her designee, shall inform the pupil that the pupil has the right to request that his or her parent or guardian or an adult family member, or person on the list of emergency contacts for the pupil be present during the questioning.

R.I. Gen. Laws § 16-21.5-3(a).

18

statutory or administrative provision." <u>Davis v. Scherer</u>, 468 U.S. 183, 194 (1984) (emphasis added). Put another way, "a state official's violation of a state statute or regulation, not itself the basis of the federal suit, should not deprive the official of qualified immunity from damages for violation of other statutory or constitutional provisions." <u>Goyco de Maldonado v. Rivera</u>, 849 F.2d 683, 687 (1st Cir. 1988) (citing <u>Davis</u>, 468 U.S. at 193-96). Simply put, neither police department policy nor Rhode Island statutes can determine whether federal law was clearly established.

Plaintiffs also argue that even if the law on Coach Marchand's authority to consent was not clearly established, the officers still acted unreasonably because the consent was the product of coercion and therefore invalid. The voluntariness question -- that is, whether consent to a search was the product of duress or coercion (express or implied) -- is determined from the totality of the circumstances. <u>United States v. Dunbar</u>, 553 F.3d 48, 57 (1st Cir. 2009); <u>United States v. Luciano</u>, 329 F.3d 1, 7 (1st Cir. 2003). Each case must be viewed on its own facts and in its own context. <u>United States v. Berkowitz</u>, 429 F.2d 921, 925 (1st Cir. 1970). "There is no talismanic definition of 'voluntariness' readily applicable to the myriad situations in which the police find it efficient to ask permission to conduct a consensual search." <u>United States v. Hall</u>, 969 F.2d 1102, 1106 (D.C. Cir.

1992).   Relevant  factors  include  "the  consenting  party's  age,
education,  experience,  intelligence,  and  knowledge  of  the  right  to
withhold  consent"  and  whether  the  consenting  party  was  advised  of
his  rights  and  whether  consent  was  obtained  under  "inherently
coercive  circumstances."   Dunbar, 553 F.3d at 57 (quoting United
States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999)).

In  this  case,  concerns  that  Coach  Marchand's  consent  was
coerced  are  put  to  rest  by  his  deposition  testimony.   Coach
Marchand  testified  that  in  response  to  the  officers'  request  for
consent  he  thought  about  the  safety  of  his  team,  and  the  fact  he
knew  his  team  was  innocent;  and,  he  said,  that  he  decided  to  take
the  "high  road."   (Def.s'  Mot.  for  Summ.  J.  Ex.  A  28  (Doc.  25).)[9]
From  this  it  is  obvious  Coach  Marchand  understood  the  situation  and
rendered  consent  after  careful  and  deliberate  thought.[10]   Coach

---

[9] Coach Marchand further testified:

I'm a First Amendment [sic] guy, you're getting to know
[sic], you know, and I dread to say, screw you get a
search warrant and I debated that.  Okay.  Then I said
no, that's not my role, at that point my role as coach,
I'm suppose (sic) to be the father, I'm suppose (sic) to
take them home safe.

(Defs' Mot. for Summ. J. Ex. A 29 (Doc. 25).)

[10] At one point in his deposition, Coach Marchand said he
consented because he was under duress.  However, considering his
use of the term "duress" in context, it is evident that Coach
Marchand was attempting to poetically explain the stressfulness of
the situation and the difficulty of his decision -- albeit perhaps
inartfully for Fourth Amendment purposes.  (Def.s' Mot. for Summ.
J. Ex. A 30-31 (Doc. 25).)  It does not automatically follow that
his consent was involuntary simply because he stated that he was

Marchand's consent was voluntary and the officers' qualified immunity cannot be defeated on this basis.  Accordingly, summary judgment will enter in favor of the Defendants on Counts I and III.

B.   Invasion of Privacy Claim

Little need be said about Plaintiffs' claim for invasion of privacy under R.I. Gen. Laws § 9-1-28.1 because the qualified immunity defense is "well grounded in the law of Rhode Island." Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002) (discussing "recognition of a qualified immunity defense under state law analogous to the federal doctrine"); J.R. v. Gloria, 599 F. Supp. 2d 182, 205 (D.R.I. 2009).  Plaintiffs' cause of action for invasion of privacy arises from the conduct for which the officers are immune from suit.  Summary judgment is therefore appropriate on Count IV as well.

C.   Equal Protection

"To succeed on a § 1983 equal protection claim, the plaintiffs must prove that the defendants acted in a discriminatory manner and that the discrimination was intentional." Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000); see Hayden v. Grayson, 134 F.3d 449, 453 (1st Cir. 1998).  "That is, the

---

under duress.  The Court also rejects Plaintiffs' argument that the circumstances under which Coach Marchand gave consent were inherently coercive.  See United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (affirming a finding of voluntary consent when given by a defendant surrounded by officers and holding that custody alone was not enough to show coercion).

plaintiff must establish that the defendant intentionally treated the plaintiff differently from others who were similarly situated." In re Subpoena to Witzel, 531 F.3d 113, 118-19 (1st Cir. 2008). "A discriminatory intent or purpose means that the defendants 'selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" Id. at 119 (quoting Wayte v. United States, 470 U.S. 598, 610 (1985)).

Here, Plaintiffs have failed to produce evidence sufficient to permit a reasonable jury to find that the officers' conduct was racially motivated.  Plaintiffs argue that the overwhelming circumstantial evidence proves that they were singled out based upon race.  They point to evidence that Central Falls is an ethically diverse community; the team was comprised of a number of Hispanics; the officers acknowledged members of the crowd could have just as likely perpetrated the theft but no one else was searched; and that the officers took no effective action to silence the mob from spewing racist insults.

It is the rare case in which a plaintiff can point to specific racist statements made by government officials, and circumstantial evidence may certainly demonstrate an intent to discriminate. Judge v. City of Lowell, 160 F.3d 67, 77 (1st Cir. 1998) (overruled on other grounds).  But the facts Plaintiffs have marshaled to support an inference of discriminatory animus are woefully

22

inadequate.  Circumstantial evidence consists of proof of a series of facts or circumstances from which the existence or nonexistence of another fact may be reasonably inferred.  Absolutely nothing can be inferred from Plaintiffs' evidence and to conclude otherwise is to engage in rank speculation.  See Calvi v. Knox County, 470 F.3d 422, 426 (1st Cir. 2006) (stating that at the summary judgment stage a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden).

While the evidence may reflect the officers' poor judgment in giving into an unruly mob and humiliating the boys, it does not even approach discrimination.  It is undisputed that Coach Marchand informed the officers that his team was under suspicion for the alleged theft -- or in Coach Marchand's words "the prime suspects." Furthermore, the officers only conducted their search after Coach Marchand consented.  The officers' conduct in this case resulted from the information and consent that Coach Marchand provided and not from any racial or ethnic bias.  Summary judgment on Count II will therefore enter in Defendants' favor.

D. R.I. Racial Profiling Prevention Act and Ethnic Intimidation Statute

For the reasons stated above with respect to Plaintiffs' Equal Protection claim, summary judgment must also enter on Counts V and VI, brought under Rhode Island's Racial Profiling Prevention Act, R.I. Gen. Laws § 31-21.2-3, and Ethnic Intimidation Statute, R.I.

Gen. Laws § 9-1-35.  Both statutes require discriminatory animus. The Racial Profiling Prevention Act requires that an individual be subject to disparate treatment by a law enforcement officer or agency, in whole or in part, on the basis of race or ethnicity. R.I. Gen. Laws § 31-21.2-3.  Similarly, the Ethnic Intimidation Statute allows for a cause of action when a person has been "maliciously subjected to an act or acts which would reasonably be construed as intended to harass or intimidate the person because of his or her race, religion, or national origin." Id. at § 9-1-35. Plaintiffs have presented no evidence from which a reasonable trier of fact could conclude the Defendants' actions were motivated by the Plaintiffs' race or ethnicity.  Again, it is critical to distinguish between the racist behavior and words of the mob and those of the officers.  There is no evidence to support saddling the officers with the idiocies of the adults and students in the mob.  Therefore, Defendants' Motion for Summary Judgment on Counts V and VI must be granted.

    E.    Supervisory Liability

    Plaintiffs are also seeking to hold Chief DaSilva and Chief O'Rourke liable in their capacities as supervisory officials. Supervisory liability cannot be predicated on a respondeat superior theory, and instead must stem from the supervisor's own acts or omissions. Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997). A supervisor can be held liable if (1) the behavior of his

subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.  Id. (quoting Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988) (internal quotations omitted)).

Hyperbole and speculation are behind Plaintiffs' claims for supervisory liability.  Plaintiffs have not alleged either police chief was at the scene or had prior knowledge (actual or constructive) of the situation such that it could be argued they were deliberately indifferent in failing to prevent the search. Rather, Plaintiffs rest their claims for supervisory liability on a theory of inadequate training.  Despite submitting evidence that the Coventry Police Department sent at least one of its officers to a basic and advanced school resource officer training program hosted by the National Association of School Resource Officers, Plaintiffs argue that the chiefs' failure to train its officers amounted to deliberate indifference given the inevitable likelihood officers in the Town would confront situations involving searches of public school students.  This argument asks too much. Plaintiffs have presented no evidence of "a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576,

582 (1st Cir. 1994).  Plaintiffs did submit evidence that Coventry officers have in the past responded to the high school and conducted searches, but a smattering of such incidents does not place this case within the "narrow range of circumstances," where the constitutional violation alleged occurs as "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Young v. City of Providence, 404 F.3d 4, 28 (1st Cir. 2005).  Even if the Court assumes the officers' actions amounted to a constitutional violation, the evidence submitted is inadequate to conclude Chief DaSilva or Chief O'Rourke was deliberately indifferent or wilfully blind.  See Maldonado-Denis, 23 F.3d at 582 ("[I]solated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference.").  Simply put, without a shred of evidence that the action or inaction of either chief "led inexorably to the constitutional violation," Plaintiffs' supervisory liability claims fail as a matter of law.  Maldonado, 568 F.3d at 275 (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)).

F.   Municipal Liability

Having disposed of all claims brought against the Defendants in their individual capacities, the Court addresses whether a basis exists to hold the Town of Coventry liable.  The cloak of qualified

26

immunity that protects the officers does not shield the Town from liability.  See Estate of Bennett v. Wainwright, 548 F.3d 155, 177 (1st Cir. 2008) ("[I]t is not impossible for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity.").  To prevail, however, Plaintiffs need evidence that the officers' actions constitute a constitutional violation and were caused by a "policy or custom" of the Town.  Id. (citing Martínez-Vélez v. Rey-Hernández, 506 F.3d 32, 41 (1st Cir. 2007)); see also Monell, 436 U.S. at 694.  In other words, the policy or custom must be the "moving force behind the deprivation of constitutional rights."  Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 24 (1st Cir. 2006).  To be actionable a custom or practice must be "so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  Id. at 23-24 (quoting Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997) (internal quotations omitted)).  Where a claim of inadequate training is alleged to have caused the constitutional injury, the municipality's failure to train must be the product of deliberate indifference such that the Town disregarded a known or obvious risk of serious harm from its failure to develop an adequate training program.  Estate of Bennett, 548 F.3d at 177; Young, 404 F.3d at 28.

Plaintiffs' claim for municipal liability is based on a failure to train and fails for the same reasons their claims for supervisory liability fail.   Even if a constitutional violation occurred, Plaintiffs offer no evidence of a policy, custom, practice or of any deliberate indifference on the part of the Town. Moreover, nothing Plaintiffs point to bears the requisite causal relationship to the alleged constitutional deprivation to establish liability.   Accordingly, summary judgment will enter for the Town on Plaintiffs' claims of municipality liability.

IV.   Conclusion

For all of the foregoing reasons, Defendants' Motion for Summary Judgment is hereby GRANTED, and judgment shall enter for the Defendants.

IT IS SO ORDERED.


_____
William E. Smith
U. S. District Judge
Date: 9/9/09